UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD J. ANTES,

    Plaintiff,

v.                                                    Case No. 1:12-cv-1188

                                                  Hon. Janet T. Neff

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
                                               /

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for Supplemental Security Income (SSI).

Plaintiff was born on July 11, 1966 (AR 121).[1] He alleged a disability onset date of December 16, 2009 (AR 143). Plaintiff completed a GED and has previous employment as an auto care worker at a muffler shop, a machine worker at a screw shop, a laborer/repair man at a re-sale store, a roofer and a towing driver (AR 150, 176-83). Plaintiff identified his disabling conditions as: closed head injury suffered during a fight in August 2009; limited mobility from neck down; spinal cord injury; depression; short term memory loss; cervical neurological/titanium neck piece; sleep apnea; and bi-polar (AR 148). On July 20, 2011, an ALJ reviewed plaintiff's claim *de novo* and entered a decision denying benefits (AR 18-29). This decision, which was later approved by the

---

[1] Citations to the administrative record will be referenced as (AR "page #").

Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I. LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Services*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

"The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases." *D'Angelo v. Commissioner of Social Security*, 475 F. Supp. 2d

3

716, 719 (W.D. Mich. 2007), citing *Bailey v. Secretary of Health and Human Servs.*, No. 90-3265, 1991 WL 310 at * 3 (6th Cir. Jan. 3, 1991). "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## II. ALJ'S DECISION

Plaintiff's claim failed at the fifth step. At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the application date of January 13, 2010 (AR 20). At step two, the ALJ found that plaintiff suffered from severe impairments of: insomnia; closed head injury; status post spinal fusion; chronic pain; and depression (AR 20). At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. (AR 13). Pursuant to Listing 11.18 (cerebral trauma), the ALJ evaluated plaintiff's closed head injury under Listings 11.02 (epilepsy - convulsive epilepsy (rand mal or psychomotor)), 11.03 (epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal), 11.04 (central nervous system vascular accident), and 12.02 (organic mental disorders) (AR 21-22). In addition, the ALJ evaluated plaintiff's mental impairment under Listing 12.04 (affective disorders) (AR 21-22).

The ALJ decided at the fourth step that plaintiff had the residual functional capacity (RFC):

> . . . to perform sedentary work as defined in 20 CFR416.967(a) except a sit/stand option allowing the claimant to sit or stand alternatively at will provided the claimant is not off task more than 10% of the work period; never stoop, crouch, kneel or crawl; occasionally climb ramps and stairs or balance; no repetitive rotation, flexion or extension of the neck; occasional bilateral overhead reaching; frequent bilateral handling objects, defined as gross manipulation; frequent bilateral fingering, defined as fine manipulation of items no smaller than the size of a paper clip; work is limited to 1- or 2step tasks; employed in a low stress job with only occasional decision

4

making required and only occasional changes in the work setting; and only occasional interaction with the public or coworkers.

(AR 22-23). The ALJ further found that plaintiff was unable to perform any past relevant work (AR 27).

At the fifth step, the ALJ determined that plaintiff could perform a significant number of unskilled, sedentary jobs in the national economy (AR 28-29). Specifically, plaintiff could perform the following jobs in the regional economy defined as the greater metropolitan areas of Battle Creek and Kalamazoo, Michigan: bench assembler (3,250 jobs); hand packager (3,250 jobs); visual inspector (1,500 jobs) (AR 28). Accordingly, the ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, since January 13, 2010, the date he filed the application for SSI (AR 29).

### III. ANALYSIS

Plaintiff raised three issues on appeal.[2]

**A. The ALJ's credibility finding is erroneous and not supported by substantial evidence.**

Plaintiff contends that the ALJ based his credibility determination on boilerplate language and did not contain specific reasons for the credibility determination. "It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston*, 245 F.3d at 536, *quoting Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972). An ALJ may discount a claimant's credibility where the ALJ "finds contradictions among the medical records, claimant's testimony, and other evidence."

---

[2] Contrary to the Court's notice and order directing filing of briefs, plaintiff filed his brief in the form a motion for summary judgment. *See* Notice (docket no. 9).

*Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997). The court "may not disturb" an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The threshold for overturning an ALJ's credibility determination on appeal is so high, that in recent years, the Sixth Circuit has expressed the opinion that "[t]he ALJ's credibility findings are unchallengeable," *Payne v. Commissioner of Social Security*, 402 Fed. Appx. 109, 113 (6th Cir. 2010), and that "[o]n appeal, we will not disturb a credibility determination made by the ALJ, the finder of fact . . . [w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility." *Sullenger v. Commissioner of Social Security*, 255 Fed. Appx. 988, 995 (6th Cir. 2007). Nevertheless, an ALJ's credibility determinations regarding subjective complaints must be reasonable and supported by substantial evidence. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 249 (6th Cir. 2007).

Plaintiff contends that the ALJ evaluated his credibility without addressing the factors listed in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). Plaintiff's Brief at p. 13. The applicable regulation for plaintiff's SSI claim is § 416.929(c)(3), which provides that the Commissioner will consider factors relevant to a claimant's symptoms including: (i) the claimant's daily activities; (ii) the location, duration, frequency and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (v) treatment, other than medication, the claimant receives or received for relief of her pain or other symptoms; (vi) any measure the claimant uses or has used to relieve her pain or other symptoms; and (vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

6

In her decision, the ALJ stated that her review was consistent with § 416.929 (AR 23). While the ALJ did not explicitly enumerate the seven factors listed in the regulation, she addressed these factors throughout the body of the decision (AR 23-27).[3] For example, the ALJ observed: that plaintiff lives with his girlfriend and children who take care of many daily activities (AR 21, 169-70); that plaintiff is self-sufficient with his personal hygiene; that plaintiff is able to prepare his own meals (AR 21, 169-70); plaintiff's statement that he does not go out often, but he gathers friends and family into his living room to socialize, play games and laughs(AR 22, 171-72); that plaintiff forgets to pay bills sometimes, but that he does count change, handle a savings account and use a checkbook (AR 22, 171); that there is no evidence that plaintiff required any emergency-based inpatient or outpatient care for any mental health disorders (AR 22, 197-326); and that while plaintiff reported that he is dependent on his family for many things, plaintiff attributed this dependence to his physical impairments as opposed to mental impairment (AR 22). In this regard, plaintiff testified that he was limited by mainly physical problems, i.e., his legs and backside were numb, his fingers were "all on fire" up to his shoulders, and his main complaint was pain (AR 52).

The ALJ also reviewed plaintiff's medical history in some detail. Plaintiff sought treatment on August 16, 2009 after getting into a drunken fight at a wedding the previous night (AR 23, 224-25). Plaintiff did not seek treatment immediately, but only went to the emergency room the

---

[3] Plaintiff suggests that the matters set forth in his function report (AR 168-75) are not attributable to him. Plaintiff's Brief at p. 14. This suggestion is incorrect. The record contains a function report and work history from plaintiff (AR 168-83). The function report was transcribed for plaintiff by Chasley Benson (AR 168-75). The work history report was also transcribed by Chasley Benson, who stated in the remarks, "I'm Chasley Benson and I have tried to complete this to the best of his [plaintiff's] knowledge but he has severe closed head injury and he is getting to [sic] much confused you should understand his condition from last doctor's visit his heart rate is jumping from stressing [sic] and his doctor wants no stress" (AR 183). The Court notes that the record contains a separate third party function report submitted by Chasley Benson which contains *her* evaluation of plaintiff (AR 160-67).

following day because his family insisted (AR 23, 224-25). A head CT scan showed no evident intracranial injury and a cervical spine x-ray showed no fracture, but it showed lower cervical degenerative disc disease, carotid atherosclerosis and bilateral apical lung scarring (AR 23, 227-28). Plaintiff was transferred to a different hospital where he underwent an MRI and subsequent surgery after being diagnosed with "C5-6 and C6-7 cord compression with bilateral upper and lower extremity weakness" (AR 24, 201). Plaintiff noted some improvement in his arm and leg strength, but he was not back to normal (AR 24, 201-02). After his discharge, plaintiff was told to wear a cervical collar at all times and was sent for physical therapy on August 31, 2009 (AR 24, 272-92). The therapist noted that plaintiff suffered from a traumatic brain injury and a status post-surgery (AR 24, 321).

Plaintiff underwent a mental examination with the Southwest Regional Rehabilitation Center on August 28, 2009 (AR 25, 231-33). Jeffrey Andert, Ph.D., opined that plaintiff might suffer from post traumatic stress disorder (PTSD) since he experienced no mental problems prior to his injury (AR 25, 231-32). Dr. Andert assessed plaintiff as suffering from an adjustment disorder with depressed mood and a cognitive disorder, with a Global Assessment of Functioning Score of 65 (AR 25, 231-32).[4] The doctor recommended further assessment to rule out PTSD (AR 231-32).

---

[4] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id*. at 32. The GAF scale ranges from 100 to 1. *Id.* at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*

However, there is no record that Dr. Andert performed that assessment. A later assessment by Timothy Strang, Ph.D. in November 2009 did not include a diagnosis of PTSD (AR 244).

Plaintiff sought treatment for insomnia in September 2009 and received medication to help him sleep (AR 25, 239). There is no evidence that plaintiff saw a sleep specialist (AR 25, 305, 313).

By October 9, 2009, plaintiff's rehabilitation doctor, Dr. Yilmaz, noted that plaintiff no longer needed an assistive device to walk (AR 24, 319). Upon his discharge from rehabilitation, Dr. Velimirovic noted that plaintiff had a steady gait with full strength in his legs, but some weakness in the arms (AR 24, 278). Plaintiff was instructed to wear his cervical collar and report for follow-up in two months (AR 24, 279).

On November 18, 2009, Dr. Strang performed a consultative mental health examination and assessed plaintiff as suffering from a depressive disorder, single episode, of moderate severity (AR 25, 241-44). In his report dated December 3, 2009, Dr. Strang noted that plaintiff's physical problems were a major factor in his psychological issues (AR 25, 241-44).

On January 6, 2010, Alain Y. Fabi, M.D., a neurosurgeon, examined plaintiff for follow-up of the surgery (anterior cervical disk and fusion at C5-C7) (AR 26, 245). Dr. Fabi felt that plaintiff was probably disabled due to cognitive impairments and had no reason to expect improvement at any time soon (AR 26, 245). Although not quoted in the ALJ's decision, Dr. Fabi opined that plaintiff had significant problems with his mental functioning after suffering the August 2009 closed head injury:

> Mr. Antes is here today in follow up after anterior cervical disk and fusion at C5-C7. He had an assault where he was struck in the back of the head with a pipe iron and suffered a closed head injury as well as a spinal cord injury. The spinal cord injury was due to a herniated disk and significant compromise of the spinal canal.

9

> He is left with persistent numbness, tingling, myelopathic features of the upper and lower extremities. The patient is still having quite a significant problem with his neck. The imaging studies, at least a plain x-ray, show the interbody graft to be in good position as well as the anterior cervical plate. Because of the persistent nature of the pain and the degree of pain that he is having, I think it is probably appropriate that we repeat the MRI to be absolutely sure there are no other issues above or below the area of concern and actually look at the surgical site as well. The patient is also having issues in my opinion with post traumatic brain symptoms and post concussive symptoms with cognitive difficulty, memory difficulty, concentration difficulty, headache, etc. It is my opinion with both of these and the significant findings, that would suggest he is, in all likelihood, permanently disabled as a result of the assault. I really do not see, at least to my eye and on examination to suggest that he is going to get significantly better at least any time soon.
>
> I have instructed the patient to look into disability for him. Again, the patient has had significant injury both of his spinal cord and TBI. I will see him back after the MRI is completed to determine if there is anything further that we can or should do with his neck and just for a routine follow up.

(AR 245).

On January 26, 2010, plaintiff established his primary care with Curtis Simmons, M.D., complaining of muscles spasms and neck pain, which the doctor treated with medication (AR 25, 293). Although the ALJ did not note it, one of the doctor's diagnoses was intracranial injury (AR 293). In evaluating plaintiff's mental status, while the doctor found that plaintiff was "[o]riented to person place time situation," plaintiff had deficits in the other areas of mental functioning, i.e., plaintiff's recent memory was impaired, plaintiff's remote memory was impaired, plaintiff's fund of knowledge was impaired, and plaintiff's mood was anxious (AR 293). Plaintiff returned the next month and reported that his neck pain and spasms felt much better and an examination showed no acute distress and an improved range of motion in his neck (AR 25, 315). Plaintiff returned to the doctor a few times during the summer of 2010 complaining of soreness, but Dr, Simmons noted that plaintiff remained active, including lifting weights, and while complaining of soreness in the cervical spine, plaintiff never appeared in distress (AR 25, 307, 309, 311).

10

On April 10, 2010, Samer Elfallal, D.O.performed a consultative physical health examination and noted that plaintiff suffered from a history of a closed head injury, but appeared alert and oriented with immediate recall (AR 25, 299). After plaintiff admitted he was capable of drinking 20 beers a day, Dr. Elfallal assessed physical findings of peripheral neuropathy suggested an alcohol-induced subcortical dementia as well as posterior cord, possibly degeneration secondary to vitamin deficiency (AR 25, 300). While plaintiff stated that he suffered a history of memory issues, upon examination, he successfully recalled three objects after five minutes without any hints and performed the serial 7's and appeared cognitively aware of that occurrence (AR 25, 300). Dr. Elfallal strongly recommended the claimant stop drinking and receive help in abstaining (AR 25, 300).

On January 3,2011, Dr. Simmons examined the claimant and found no atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis or extremities and no decreased range of motion, instability, misalignment, asymmetry, crepitation, defects, tenderness, masses or effusion in the musculoskeletal system (AR 24, 305).

The ALJ evaluated plaintiff's credibility referring specifically to plaintiff's alleged need of a cane and his educational background:

> The claimant alleged disability due primarily to the effects from being hit in the neck several years ago; however, the record includes evidence strongly suggesting that the claimant has exaggerated symptoms and limitations. During his consultative physical examination, the claimant stated he required a cane for ambulation, but he failed to bring the cane to the exam (Ex. 12F at 1). Additionally, the claimant received physical therapy from the Southwest Regional Rehab Center, and, on October 9, 2009, Dr. Yilmaz, the rehabilitation doctor, noted the claimant no longer needed an assistive device to walk (Ex. 14F at 3).
>
> Furthermore, the claimant provided conflicting information regarding education level. The claimant testified at the hearing that he only completed the 8th

or 9th grade while in school (*Hearing*). However, the claimant reported on the Disability Report, Form SSA-3368, that he earned a GED in 1984 (Ex. 2E at 3).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(AR 23).[5]

Plaintiff contends that the ALJ did not address plaintiff's credibility with respect to his medical condition. The Court disagrees. As discussed, the ALJ reviewed the factors pursuant to § 416.929(c) and set forth detailed medical history. Her credibility assessment was based on two examples of plaintiff's inconsistent statements which exaggerated his limitation, i.e., his need for an assistive device to ambulate and his limited education. Under the circumstances of this case, the ALJ could find that plaintiff was not a credible witness. Given this record, the Court does not find a "compelling reason" to disturb the ALJ's credibility determination. *See Smith*, 307 F.3d at 379. Accordingly, plaintiff's claim of error should be denied.

> **B. The ALJ failed to follow the treating physician's rule when evaluating the medical opinions from Dr. Simmons.**

Plaintiff contends that the ALJ improperly rejected the opinion of his treating physician, Dr. Simmons. A treating physician's medical opinions and diagnoses are entitled to great weight in evaluating plaintiff's alleged disability. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters*, 127 F.3d at 529-30. "The treating physician

---

[5] During the hearing, plaintiff explicitly denied that he had earned a GED (AR 45). The typewritten disability report states that plaintiff completed a GED in 1984 (AR 149).

doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations"). Under the regulations, "[t]reating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375 (6th Cir. 2013), quoting 20 C.F.R. § 404.1527(c)(2).

An ALJ is not bound by the conclusory statements of doctors, particularly where the statements are unsupported by detailed objective criteria and documentation. *Buxton*, 246 F.3d at 773. In summary, the opinions of a treating physician "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip*, 25 F.3d at 287. Finally, the ALJ must articulate good reasons for not crediting the opinion of a treating source. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2) ("[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").

13

The ALJ addressed Dr. Simmons' opinions as follows:

> Dr. Simmons also prepared a residual functional capacity assessment and assessed the claimant capable of lifting less than 10 pounds rarely and incapable of even low stress jobs (Ex. l5F). The doctor further opined the claimant could stand for 5 minutes and sit for less than 5 minutes at one time; sit or stand less than 2 hours each during an 8-hour workday; never grasp with his hands, manipulate with his fingers or reach with his arms; never perform postural activities; and miss more than 4 days per month due to his impairments (*Id.*).
>
> As for the opinion evidence, although my above-assessed residual functional capacity takes into account the many of Dr. Simmons' limitations for the claimant, I reject Dr. Simmons' statement due to the doctor's report appearing to contain inconsistencies, which accordingly renders his opinion less persuasive. In his examination on January 3,2011, Dr. Simmons expressly found no atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis or extremities and no decreased range of motion, instability, misalignment, asymmetry, crepitation, defects, tenderness, masses or effusion in the musculoskeletal system (Ex. 13F at 5).
>
> The doctor's opinion appears to rest at least in part on an assessment of an impairment outside the doctor's area of expertise. Dr. Simmons cited the claimant's depression and anxiety as contributing factors to the claimant's alleged inability to work; however, Dr. Simmons is not a mental health specialist and never referred the claimant to a mental health specialist (Ex. 13F). Moreover, the doctor specifically noted the claimant appeared with a normal mood and affect during examinations (Ex. 13F at 2,5,7,9, 11, 13 and 15).
>
> Additionally, the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The claimant himself testified he could sit upwards of 20 minutes at a time, far greater than Dr. Simmons' assessment of sitting for less than 5 minutes (*Hearing*; Ex. l5F).
>
> Furthermore, the possibility always exists that Dr. Simmons expressed an opinion in an effort to assist a patient with whom he sympathizes for one reason or another. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(AR 26).

The Court concludes that the ALJ did not articulate good reasons for rejecting Dr. Simmons' physical RFC questionnaire from May 25, 2011 (Exh. 15F). While the ALJ states that Dr. Simmons' RFC questionnaire contained inconsistencies, she provides little specific information on the actual inconsistencies. For example, the ALJ pointed out the discrepancy between plaintiff's testimony that he can sit for up to 20 minutes with Dr. Simmons' opinion that plaintiff can sit for only five minutes at a time (AR 324). However, the ALJ did not accurately cite plaintiff's testimony, i.e., that he could sit "[a]nywhere from 10 to 20 minutes" (AR 57).

In addition, the court disagrees with the ALJ's rejection of Dr. Simmons' opinions regarding plaintiff's depression and anxiety because Dr. Simmons was not a mental health specialist and never referred plaintiff to a mental health specialist. It is well established that an ALJ can discount a *psychologist's* opinion about the claimant's *physical* functioning, because a psychologist is not qualified to diagnose a physical condition. *See Buxton*, 246 F.3d at 775. However, as an M.D. licensed to practice medicine in Michigan, Dr. Simmons is qualified to treat both physical and mental conditions. *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (a duly licensed physician under the laws of most states, can practice and render psychiatric services, i.e., prescribe psychotropic medication, conduct psychotherapy, etc.); M.C.L. § 333.17001(f) ("'Practice of medicine' means the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical *or mental condition,* by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts") (emphasis added). "While the medical profession has standards which purport to restrict the practice of psychiatry to physicians who have completed residency training programs

15

in psychiatry, it is well established that primary care physicians (those in family or general practice) 'identify and treat the majority of Americans' psychiatric disorders.'" *Sprague*, 812 F.2d at 1232. Thus, for purposes of a disability claim, "[a] treating physician's opinion on the mental state of his patient constitutes competent medical evidence even though the physician is not a certified psychiatrist." *Bushor v. Commissioner of Social Security*, No. 1:09-cv-320, 2010 WL 2262337 at * 10, fn. 4 (S.D. Ohio April 15, 2010). *See also*, *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) (where a medical doctor treating a claimant for chronic pain expressed opinions regarding the claimant's mental restrictions, those opinions constituted "competent psychiatric evidence" and may not be discredited by an ALJ on the ground that the doctor is not a board certified psychiatrist). It also appears from the ALJ's discussion set forth above, that the ALJ was too ready to simply assume that plaintiff was overly insistent that Dr. Simmons exaggerate his symptoms and that Dr. Simmons was equally ready to capitulate to this demand. Accordingly, the Court concludes that the ALJ did not give good reasons for rejecting Dr. Simmons' opinion regarding plaintiff's physical limitations, as well as the doctor's opinion that plaintiff's anxiety and depression affected his ability to perform even low stress jobs.

For these reasons, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Commissioner should re-evaluate Dr. Simmons' opinions expressed in the doctor's physical RFC questionnaire.

> **C. The ALJ's Step Five determination that there is a significant number of jobs that plaintiff can perform is not supported by substantial evidence.**

Plaintiff contends that the hypothetical question posed to the vocational expert (VE) did not account for his mental limitations. An ALJ's finding that a plaintiff possesses the capacity

16

to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through the testimony of a VE in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *See Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004); *Varley*, 820 F.2d at 779. However, a hypothetical question need only include those limitations which the ALJ accepts as credible. *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990). *See also Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118 (6th Cir. 1994) ("the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals"). Because the purpose of the hypothetical question is to elicit testimony regarding a claimant's ability to perform other substantial gainful activity that exists in the national economy, the question does not need to include a listing of the claimant's medical diagnoses. "[A] hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions." *Webb*, 368 F.3d at 632.

Here, the ALJ posed a hypothetical question to the VE which reflected the RFC determination (AR 68-69). Both the RFC determination and the hypothetical question were based, in part, upon the ALJ's review of Dr. Simmons' opinions. Assuming that the ALJ did not err in evaluating those opinions, then the hypothetical question posed to the VE accurately portrayed plaintiff's physical and mental limitations. However, as discussed, *supra*, the undersigned concluded that a reversal and remand under sentence four is in order because the ALJ erred in evaluating Dr. Simmons' opinions, i.e., she failed to articulate good reasons for rejecting the

17

doctor's opinions, she rejected the doctor's opinions regarding plaintiff's depression and anxiety, and she apparently assumed that Dr. Simmons accepted plaintiff's exaggerated reports of symptoms. If the Court agrees with the undersigned that the ALJ erred with respect to Dr. Simmons, then the hypothetical question posed to the VE had the same infirmities as the RFC determination and, as a result, did not accurately portray plaintiff's physical and mental limitations. Accordingly, if the Court adopts the undersigned's recommendation with respect to the ALJ's evaluation of Dr. Simmons' opinions, then the Commissioner should re-evaluate the vocational evidence at the fifth step of the sequential process.

## IV. Recommendation

For the reasons discussed, I respectfully recommend that the Commissioner's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Commissioner should re-evaluate Dr. Simmons' opinions expressed in the doctor's physical RFC questionnaire and, if necessary, re-evaluate the vocational evidence.


Dated: February 25, 2014                    /s/ Hugh W. Brenneman, Jr.
                                            HUGH W. BRENNEMAN, JR.
                                            United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).